**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

MANUEL DAVILLA,                    *

Petitioner,                        *

v                                  *            **Civil Action No. GJH-15-2877**

WARDEN CARROLL PARISH, et al.,     *

Respondents.                       *
                                 ***

**MEMORANDUM OPINION**

Manuel Davilla petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. Respondents filed an Answer asserting, in part, that Petitioner's claims are procedurally defaulted and therefore not subject to substantive federal habeas corpus review. ECF No. 9; ECF No. 13.[1] Petitioner Manuel Davilla filed a Reply, addressing the allegation that his claims are procedurally defaulted. ECF No. 11. The Reply asserts that Respondents neglected to file his supplemental Application for Leave to Appeal the denial of post-conviction relief which Davilla maintains was filed with the Maryland Court of Special Appeals. ECF No. 12. The supplemental pleading includes claims raised in the post-conviction proceedings, but does not bear Davilla's signature, and is not dated. ECF No. 12-2. This Court finds that a hearing is not necessary to resolve the matters pending in this case. For the following reasons, the Petition is denied and a certificate of appealability shall not issue.

I.      **BACKGROUND**

Davilla was tried before a jury in the Circuit Court for Montgomery County on charges of attempted first degree murder, first degree assault, carrying a deadly weapon with the intent to injure, and three counts of misuse of a telephone in connection with an assault on Sonia

---

[1] The exhibits in support of the Response are docketed electronically at ECF No. 13.

Calderon, his ex-girlfriend. ECF No. 13- 1. Davilla stood trial January 14 through 18, 2008. ECF Nos. 13-2–13-6. On April 25, 2008, Davilla was sentenced to an aggregate sentence of 40 years. ECF No. 13-7 at 37–46.

## A. Facts Produced at Trial

The State produced evidence, mainly through the testimony of Sonia Calderon, Carlos Mejias, Ms. Calderon's sons, and two police officers, of the following facts. Ms. Calderon testified that she and Davilla began dating in November of 2004 and after a brief break up in July of 2006, began dating again in November 2006. ECF No. 13-3 at 86.[2] Ms. Calderon ended their relationship in January of 2007, but allowed Mr. Davilla to remain in the apartment because he was unemployed and had nowhere to live. *Id*. at 86–87. Also sharing the apartment was Mr. Davilla's sister, Gloria Torres. *Id*. at 87.

Mr. Davilla moved out of the apartment he shared with Ms. Calderon and his sister, Gloria Torres, at the beginning of March, 2007. ECF No. 13-3 at 88. According to Ms. Calderon's testimony, she did not see him after he moved out, but he called on the phone stating he wanted to come back; she said these calls increased from two to three times a week to calls all day long by March 14, 2007. *Id*. at 88–89. Mr. Davilla called Ms. Calderon continuously on March 14, 2007 because he had seen her with Carlos Mejias. *Id*. at 90–91. Ms. Calderon twice told Mr. Davilla she did not want to speak to him, and then simply turned off her phone to avoid hearing the calls come in. *Id*.

Over the defense counsel's continuing objection (*see* ECF No. 13-3 at 92–112; 161–62), Ms. Calderon testified that Mr. Davilla came to her apartment on March 14, 2007, where he confronted Ms. Calderon and Mr. Mejias about the nature of their relationship. ECF No. 13-3 at

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

168–69. [3] Ms. Calderon testified that she and Mr. Mejias denied they were involved romantically, but Mr. Davilla appeared agitated. The conversation took place on the deck outside of the apartment's kitchen; Mr. Davilla went into the kitchen and Ms. Calderon observed him approaching Mr. Mejias, whose back was to the sliding glass door, with a knife. Mr. Mejias talked Mr. Davilla out of using the knife to hurt Mr. Mejias. *Id.* at 171–75, *see also* ECF No. 13-5 at 16–18 (testimony of Carlos Mejias). Gloria Torres had let Mr. Davilla into the apartment on that day. *Id.* at 176.

The following day, March 15, 2007, Ms. Calderon was going to work to return supplies given to her for her house-cleaning job when she saw Mr. Davilla driving his truck nearby and, subsequently, parked across the street when she was leaving to return home. ECF No. 13-3 at 198–200. Concerned, Ms. Calderon called one of her adult sons to ask that he convince Mr. Davilla to leave her alone. *Id.* at 201. Mr. Davilla then called Ms. Calderon while she was driving home and asked her what time she would be home because he had neglected to take some of his property from the apartment when he moved out. *Id.* Ms. Calderon informed him that she was going to the store before returning home. *Id.* Before going into the apartment, Ms. Calderon called her son to ask him to come over and called Gloria Torres to confirm that she was in the apartment. *Id.* at 202. Because Ms. Torres was in the apartment, Ms. Calderon felt it was safe to go inside with Mr. Davilla there. *Id.* at 203. As Ms. Calderon and Mr. Davilla were walking into the apartment she noticed that Mr. Davilla was carrying a black bag with a can in it. *Id.* When asked, Mr. Davilla claimed the items in the bag belonged to Ms. Calderon's sons with

---

[3] The objection to Ms. Calderon's testimony regarding March 14, 2007 was that the testimony concerned "prior bad acts" by Mr. Davilla. The court overruled after holding a hearing and listening to Ms. Calderon's proffered testimony. The court reasoned that under Maryland law the evidence could come in under the "MIMICS" exception to the hearsay rule as the evidence was offered to show that Mr. Davilla's motive for the assault on Ms. Calderon was jealousy. ECF No. 13-3 at 158–59. The court further observed that it would exclude Mr. Mejias from testifying to the legal conclusion that he did not view Mr. Davilla's actions on March 14, 2007 as an assault against him. *Id.* at 160.

whom he had worked on occasion. *Id*. at 205. Through Ms. Calderon's testimony, the State introduced a can of paint thinner that looked similar to the one Mr. Davilla was carrying that day into evidence, but after defense counsel objected, the label indicating that it was paint thinner was obscured from the jury's view. *Id*. at 207–13.

Once inside the apartment, Ms. Calderon testified that Mr. Davilla put the can down on the floor and removed "some kind of rope" from the bag. *Id*. at 214. She stated that he kept the black bag in his hand as he walked back toward her bedroom. *Id*. at 215. Ms. Calderon followed him and asked Mr. Davilla why he was going to the bedroom as he had no right to do so. *Id*. at 216. She stated that Mr. Davilla replied that he did have that right and that he squatted down to remove something from the bag, grabbed Ms. Calderon by the arm, and began trying to pull her into the bedroom. *Id*. In a defensive move, Ms. Calderon bent over to prevent Mr. Davilla from pulling her into the bedroom. *Id*. at 217. As she did so, Mr. Davilla hit her on the head with the object he had removed from the bag. *Id*. Ms. Calderon screamed for Ms. Torres to call the police because Mr. Davilla was hitting her. *Id*. Ms. Torres came out of her bedroom and Ms. Calderon went into that room, and closed the door to escape Mr. Davilla. *Id*. at 218. As she waited, Ms. Calderon felt the blood from her wound begin to come down onto her face. *Id*. at 219.

Once convinced that Mr. Davilla had left, Ms. Calderon opened the door and saw Ms. Torres. ECF No. 13-3 at 220–21. Ms. Torres provided a compress to Ms. Calderon to apply to the wound to her head, but did not comply with Ms. Calderon's request to call the police. *Id*. at 224–25. Ms. Calderon's cell phone was in another area of the apartment, but after she looked at her head wound in the mirror and saw that it was very deep, she retrieved her phone and called her son who was on his way to the apartment. *Id*. at 225–26. She changed her shirt before going to the hospital because the one she was wearing was soaked in blood; the blood-soaked shirt was

gone from the apartment when she returned later. *Id*. at 232–33. Ms. Calderon did not call the police because she was undocumented and afraid that she would face immigration consequences. *Id*. at 233.

Ms. Calderon testified that when she arrived at the hospital medical staff administered anesthesia, cauterized a vein, and closed the wound to her head with staples and sutures. ECF No. 13-3 at 245. Over objection by defense counsel, pictures of Ms. Calderon's wound were entered into evidence despite their graphic nature as the defense intended to argue that her wound was self-inflicted. *Id*. at 245–51. Additional photographs taken of Ms. Calderon's injuries five days after the assault at a crisis center were introduced through her testimony. ECF No. 13-4 at 6–10. The additional photographs depicted bruises in the shape of a hand to Ms. Calderon's arm, *id*. at 9; bruising to her shoulders, *id*. at 10; and a picture of bruising and swelling to her face, *id*. at 11–12.

On March 20, 2007, Mr. Davilla left Ms. Calderon eighteen phone messages, which were authenticated through Ms. Calderon and played for the jury. ECF No. 13-4 at 14–16. The transcript of Ms. Calderon's testimony does not provide the content of those messages.

Cross examination of Ms. Calderon focused on her credibility. She lied on her applications for employment and to obtain a Maryland state identification card regarding both her name and her immigration status. ECF No. 13-4 at 55–59. At a hearing outside the presence of the jury, the State objected to defense counsel's anticipated questions indicating that Ms. Calderon was a drug dealer in Guatemala prior to coming to this country. *Id*. at 74–76. During that hearing, the State developed that Ms. Calderon's husband went to prison for dealing drugs in Guatemala before she came to the United States. *Id*. at 76. Ms. Calderon denied fleeing prosecution for offenses similar to her husband's and denied transporting drugs between

Guatemala and the United States or Mexico. *Id*. at 76–78. The court then sustained the State's objection to the line of questioning. *Id*. at 78. Defense counsel also focused on Ms. Calderon's failure to call the police and her delay in applying for an order of protection as well as the alleged promise that her immigration status would be changed to legal status if she pursued and cooperated in charges against Mr. Davilla.[4] *Id*. at 97–141.

Carlos Mejias testified for the State and provided an account of the events occurring on March 14, 2007, consistent with Ms. Calderon's testimony. ECF No. 13-5 at 5–17. Mr. Mejias also testified that Ms. Calderon called him from the hospital on March 15, 2007, and that he went with her to the police station to assist in filing a complaint against Mr. Davilla. *Id*. at 20–21. Mr. Mejias acted as an interpreter and wrote in English what Ms. Calderon told him in Spanish. *Id*. at 23.

Nicholas Cardillo Calderon (Nicholas Cardillo), one of Ms. Calderon's two adult sons, testified for the State. He verified that on March 15, 2007, Ms. Calderon called him to say that Mr. Davilla was at her work place and from the parking lot of her apartment complex asked him to come there quickly so he could speak with Mr. Davilla. ECF No. 13-5 at 42–44. During the call from the apartment complex parking lot, Nicholas Cardillo related that his mother told him she was going into the apartment because Gloria Torres was inside. *Id*. at 45. The third phone call he received from his mother was after she had been hit. *Id*.

Nicholas Cardillo also testified that he never kept any work supplies at his mother's apartment and that there would be no reason why Mr. Davilla would bring rope to the apartment for him to use at work. ECF No. 13-5 at 51–53. While he was at the police station with his mother, Nicholas testified that Mr. Davilla messaged him indicating he wanted Nicholas to call

---

[4] On redirect Ms. Calderon explained that she was not aware of any possibility that her immigration status could be changed because she was a victim of domestic violence and was cooperating with police until after she had filed charges against Mr. Davilla. ECF No. 13-4 at 165–66.

him so he could explain his side of the story. *Id*. at 54. Nicholas testified that he called Mr. Davilla because his mother had asked him to in the hope Nicholas could convince Mr. Davilla to leave her alone. *Id*. at 56. When Nicholas spoke to Mr. Davilla, Mr. Davilla said that he was going to hit Ms. Calderon until she couldn't take it anymore; tie her up; pour paint thinner on her body and burn her because she deserved it. *Id*. Mr. Davilla told Nicholas he planned to take these same actions against Mr. Mejias before then castrating Mr. Mejias, forcing Ms. Calderon to eat the genitals, and then killing them both. *Id*. at 57–62. Mr. Davilla further explained to Nicholas Cardillo that on March 15, 2007, his plan to beat Ms. Calderon, tie her up, and burn her, was thwarted because Ms. Calderon ran off and Gloria Torres stopped him. *Id*. at 65–67. Cross-examination of Nicholas Cardillo focused on bias in favor of his mother. *Id*. at 67–80.

Ms. Calderon's other adult son, Rafael Cardillo, also testified for the State. During his testimony he recalled seeing a can, similar to that introduced as demonstrative evidence during his mother's testimony, inside his mother's apartment on March 15, 2007. ECF No. 13-5 at 86-89. Rafael also stated that he works as a painter and that cans similar to the one he saw contain paint thinner. *Id*. at 89. He also confirmed that he did not keep work materials at his mother's apartment. *Id*. at 90.

The final two witnesses for the State were police officers for Montgomery County. Detective Karen Carvajal testified that her limited involvement in the case came about because she works in the Family Crimes Unit and is a certified Spanish language interpreter. ECF No. 13-5 at 104–09. Detective Carvajal translated Ms. Calderon's account of what had occurred for Detective Anthony Chuckeral and confirmed that Ms. Calderon reported that Mr. Davilla grabbed something out of the bag and hit her with it. *Id*. at 112. Detective Chuckeral also

testified, but provided no additional evidence that differed from what had already been produced. *Id*. at 120-31.

The only witness to testify during the defense's case-in-chief was Gloria Torres, Mr. Davilla's sister. ECF No. 13-5 at 144–51. Ms. Torres testified on direct examination that she was in the kitchen of the apartment when Ms. Calderon and Mr. Davilla entered the apartment together on March 15, 2007. *Id*. at 146–47. She claimed that the two of them walked back to Ms. Calderon's bedroom "very calmly" and that no one screamed while the two were in that area of the apartment. *Id*. She further claimed that Ms. Calderon came back into the kitchen where Ms. Torres was and that she did not have any blood on her. *Id*. Then Ms. Torres testified that Ms. Calderon went into Ms. Torres's bedroom and Ms. Torres heard a noise like someone had bumped into something; she claimed Ms. Calderon stayed in her bedroom for ten minutes. *Id*. After her brother left, Ms. Torres said that Ms. Calderon came into the kitchen and Ms. Torres observed "a little thread of blood" on her forehead. *Id*. at 148. Ms. Torres claimed there was a lot of furniture in the hallway and that she saw Ms. Calderon on the floor, picking herself up after falling down. *Id*. at 149-50.

Ms. Torres's testimony did not hold up to cross-examination. ECF No. 13-5 at 151–70. The State established that if Ms. Torres had been standing in the kitchen she could not see the door into the apartment (*id*. at 153) and that in her statement to police, she said she was in her bedroom when her brother and Ms. Calderon entered the apartment. *Id*. at 159-70. Ms. Torres was so upset after the State discredited her on cross-examination that defense counsel described her as "freaking out," and the court discussed whether she required medical treatment. ECF No. 13-5 at 172–73. During sentencing, the court referred to Ms. Torres' testimony as "preposterous", ECF No. 13-7 at 28, and commented that there was "a lot of evidence" to

support a perjury charge, *id*. at 41. During closing argument, defense counsel conceded that Ms. Torres' testimony "was disastrous." ECF No. 13-6 at 72.

**B. Procedural History**

Davilla filed a direct appeal of his conviction asserting that it was error for the trial court to deny a motion to sever and it was error for the trial court to admit other crimes evidence regarding an alleged assault that occurred against a different individual on the day before the Calderon assault. ECF No. 13-8 (brief of appellant). On January 6, 2010, in an unreported opinion, the Maryland Court of Special Appeals affirmed Davilla's conviction. ECF No. 13-10 (opinion and mandate). Davilla did not seek certiorari review of the Court of Special Appeals decision; therefore, the judgment became final on January 21, 2010, when the time for doing so expired.

Davilla also filed a motion for reconsideration of sentence and for a three-judge panel review on May 12, 2008. The motion for reconsideration was denied on November 22, 2010. On May 3, 2013, the three judge panel granted relief on Davilla's motion and imposed a new, reduced sentence of 30 years as to the attempted first degree murder conviction; the concurrent sentences for telephone misuse were reimposed. ECF No. 13-1 (docket entries).

A petition for post-conviction relief was filed with the Circuit Court for Montgomery County on January 22, 2013. ECF No. 13-11. Davilla alleged in his post-conviction petition that: appellate counsel was ineffective for failing to raise a claim regarding the trial court's use of a voir dire question regarding his ethnic heritage and lack of citizenship in this country; ineffective assistance of trial counsel for: failing to use an interpreter at all appropriate times; failing to subpoena witnesses for its case-in-chief; "lambasting" the only defense witness called during closing argument; failing to prepare the defense's witness for trial; and the cumulative effect of

these errors. *Id.* On June 18, 2014, the state court denied all post-conviction relief. ECF No. 13-12.

Davilla filed an application for leave to appeal the denial of post-conviction relief that raised no particular allegations of error, but stated that he was in the process of "applying for a private attorney and intends to supplement this application promptly." ECF No. 13-13. After Davilla was granted the opportunity to file a Reply to Respondents' assertion that his claims had not been properly presented to the state courts for consideration and were procedurally defaulted, he filed what purports to be the supplement to his application for leave to appeal. ECF No. 12-2. The application for leave to appeal was denied on May 29, 2015. ECF No. 13-1 at 29; ECF No. 13-14.

### C. Claims in this Court

In his petition for habeas relief Mr. Davilla alleges that appellate counsel was ineffective when he did not raise a claim alleging trial court error when it asked a voir dire question of the jury pool indicating that he is a Guatemalan citizen and declining to use language suggested by defense counsel, ECF No. 1 at 8–10; that trial counsel was ineffective for failing to have an interpreter present during the motions hearing; failing to bring an interpreter to the jail to assist in communicating the plea offer, *id.* at 10–13; failing to subpoena witnesses to impeach the victim, *id.* at 13–15; "lambasting" the only defense witness during closing argument, *id.* at 15; failing to prepare the only defense witness for cross-examination, *id.*; and that the cumulative effect of these errors deprived him of a fair trial, *id.* at 16.

### II.  STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28

U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S.415, 419-20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable

application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.*" Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U. S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v.*

*Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v.*

*Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-

conviction relief). A procedural default also may occur where a state court declines "to consider

the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts*

*v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

As the Fourth Circuit has explained:

> If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n.1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a state

prisoner's habeas claim unless the petitioner can show (1) both cause for the default and

prejudice that would result from failing to consider the claim on the merits, or (2) that failure to

consider the claim on the merits would result in a miscarriage of justice, *i.e.* the conviction of

one who is actually innocent.[5] *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard*, 134

F.3d at 620. "Cause" consists of "some objective factor external to the defense [that] impeded

counsel's efforts to raise the claim in state court at the appropriate time." *Id*. (quoting *Murray*,

_____

[5] Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. *See Murray v. Carrier*, 477 U.S. at 496. "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id*.; *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

477 U.S. at 488). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U. S. 298, 314 (1995).

### III.    ANALYSIS

While Mr. Davilla provides little to no evidence in support of his assertion that he filed a supplemental application for leave to appeal raising all claims that were raised at post-conviction with the Maryland Court of Special Appeals and subverting Respondents' assertion that all claims have been procedurally defaulted, the Court will, out of an abundance of caution, presume that the supplemental application was filed and considered by the appellate court when it denied the application. Each of Mr. Davilla's claims are thus analyzed below.

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.

Because the instant petition is subject to the provisions of the federal habeas statute, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), in order to obtain relief on his ineffectiveness claims, the petitioner must show that the adjudication of such claims at the state court level:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (Supp.1997). The Act further provides that:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1).

As the Supreme Court held in *Strickland v. Washington*, *supra*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C.§2254(d)[ now § 2254(e)(1)]." *Id*. at 698. Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* It follows, then, that § 2254(d)(1) applies to the state court's conclusion that the petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

## A. Ineffective Assistance of Appellate Counsel

In the context of claims regarding ineffective assistance of appellate counsel, the Supreme Court has made clear that an indigent defendant does not have a constitutional right to compel his appointed appellate counsel to raise every conceivable claim on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Further, the Court observed that "[e]xperienced advocates

since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id*. at 751-52.

Mr. Davilla's claim regarding appellate counsel is that he should have alleged on appeal that the following question from the trial court to the jury panel was improper:

> Mr. Davilla is a Guatemalan citizen. Other witnesses may be citizens of other countries as well that testify in this case. All individuals are given equal protection under the laws in our court system. Does any prospective juror believe that they would be unable to give either Mr. Davilla or any other witness the same, believe that they are not entitled to the same legal and constitutional rights and privileges during the course of the trial that would be afforded to a United States citizen? In other words I'm instructing you that they are given the same rights during the trial, and is there anyone that would be unable to follow that or objects to that to the point that they could not be fair and impartial in this case?

ECF No. 13-2 at 241–42. No prospective juror responded.

Mr. Davilla's trial counsel wanted the question to be asked only about the defendant to test whether the prospective jurors would be prejudiced against him. ECF No. 1 at 5–6. In analyzing his claim that appellate counsel erred when this claim was not included on appeal, the post-conviction court observed that Mr. Davilla would have to show that he was prejudiced by the failure to raise this claim on appeal. ECF No. 13-12 at 30. The court concluded that while the voir dire question used by the trial court was compound, "it adequately covered the issues that needed to be raised." *Id*. The post-conviction court went on to observe that "[t]here is no requirement, nor did [Mr. Davilla] cite any authority which requires the court to ask a voir dire question exactly how the defense requests the question . . . or proposed voir dire." *Id*. at 30–31. Finally, the post-conviction court concluded that appellate counsel is not required to advance frivolous claims and that the court was not persuaded that this issue would have been successful.

*Id.* at 31. The reasoning by the post-conviction court, as well as the application of established law to the facts, is without error. This claim does not present a basis for federal habeas relief.

### B. Ineffective Assistance of Trial Counsel

Mr. Davilla also raises multiple ineffective assistance of trial counsel claims. First he claims that trial counsel erred because there was no Spanish interpreter at a January 3, 2008 pre-trial motions hearing. ECF No. 1 at 10–11. Mr. Davilla raised this claim on post-conviction, but the claim was withdrawn at the hearing because the post-conviction judge listened to a recording of the January 3, 2008 hearing prior to the post-conviction hearing and an interpreter was present and sworn at the hearing. ECF No. 13-12 at 4–6; 31. That finding of fact by the post-conviction court will remain undisturbed by this Court in light of the deference required by 28 U.S.C. §2254(e)(1).

Second, Mr. Davilla claims trial counsel did not utilize Spanish interpreters to communicate with him in general and specifically about the State's plea offer. Mr. Davilla avers that Spanish is his native language and without an interpreter he is not able to understand what is spoken to him in English. ECF No. 1 at 10-11 and Ex. 1 and 2 (affidavit of Manuel Davilla in Spanish and English). He further claims that his trial counsel, Mary Tyler, did not speak Spanish and "without an interpreter, there is no way that Mr. Davilla could fully grasp the plea offer nor would he be able to have meaningful conversations with his attorney." ECF No. 1 at 12.

The post-conviction court noted that Mr. Davilla acknowledged that Ms. Tyler visited him three times in jail and did not bring an interpreter with her; he claimed she spent less than a half an hour with him on each occasion and that "she always told me she had other inmates to take care of." ECF No. 13-12 at 32–33. However, the post-conviction court found that Mr. Davilla could understand English and that he did not need "the luxury of a Spanish interpreter"

even though that "luxury" was provided to him at trial. ECF No. 13-12 at 35. To arrive at this conclusion, the court considered a statement from counsel who previously represented Mr. Davilla that explained that, like Ms. Tyler, he too did not take an interpreter with him to talk to Mr. Davilla in jail because he believed Mr. Davilla understood English. ECF No. 13-12 at 38. The post-conviction court also observed that at the time Mr. Davilla stood trial he had been in this country for over 30 years. ECF No. 13-12 at 35. Further, Mr. Davilla can be heard on the recordings speaking English. *Id.* All of these factors led the court to conclude that the claim that counsel was ineffective for failing to bring an interpreter to the jail to speak with Mr. Davilla was without merit. *Id.*

With regard to communicating the terms of the plea offer, the post-conviction court listened to the recorded hearings wherein Mr. Davilla was being advised on the plea offer the State had made. ECF No. 13-12 at 34–35. The post-conviction court correctly observed that Mr. Davilla would need to show that had he known about the plea offer he would have taken the offer and he was therefore prejudiced by the failure to communicate it to him. During the recorded hearings, the post-conviction court relayed that the presiding judge "tried very hard to get Mr. Davilla to understand that this was a good deal." ECF No. 13-12 at 33. In so doing, the judge referred to the pictures of the injuries to Ms. Calderon as well as the other very strong evidence against him in the case. *Id.* At that time Mr. Davilla was being offered a 10 year sentence in exchange for his guilty plea, but he could not "get past the 10 years." *Id.* Mr. Davilla expressed concern that he was too old to serve ten years, told the judge that pictures lie and refused to admit his responsibility for the crime. *Id.* Due to his protestations that he was innocent, the presiding judge would not accept a guilty plea from Mr. Davilla. *Id.* Similar results occurred at two subsequent hearings where Mr. Davilla was again offered a 10 year sentence in

exchange for his guilty plea. *Id*. at 34. At one of those hearings, Mr. Davilla stated that "he'd rather rot in jail" than admit his guilt and accept the sentence of 10 years. *Id*.

The post-conviction court also noted that Ms. Tyler was an experienced defense attorney who understood the strength of the State's evidence and would not want take the case to trial unless her client insisted. ECF No. 13-12 at 36–7 ("the only reason this went to trial is that the defendant must have - did reject the offer extended to him."). The post-conviction court observed also that "Judge Weinstein asked him twice, 'Have you talked to Ms. Tyler about this?' 'Yes.' 'Do you understand it?' 'Yes.' So to say now that he didn't [talk to trial counsel about the plea] is just not credible."

This Court must defer to the findings of fact by the post-conviction court and in light of those facts, the conclusion that Mr. Davilla's claims of ineffective assistance of counsel regarding communication via an interpreter and informing him of the plea offer are without merit is a reasonable application of the law to the facts. No viable claim for federal habeas relief is stated.

Mr. Davilla next claims that trial counsel was ineffective for failing to subpoena witnesses to impeach Ms. Calderon. ECF No. 1 at 13–15. He states that "counsel . . . attempted to rely on the prosecutor's subpoena of police witnesses to impeach the victim, a strategy that was not reasonable." *Id*. at 13. Mr. Davilla points to two instances during the trial when defense counsel made reference to witnesses who were under subpoena by the State but were not at the courthouse. *Id*. at 14–15.

The first instance concerned Mr. Mejias's potential testimony regarding the events that occurred on March 14, 2007. ECF No. 13-3 at 152–54. The court held a hearing concerning the prior bad act evidence's admissibility. Defense counsel argued that Mr. Mejias would be a good

witness for the defense but was not present at the courthouse. *Id*. Ultimately counsel proffered that Mr. Mejias would testify that he did not consider the March 14, 2007 incident to be an assault. *Id*. at 154. The trial judge indicated that testimony would not be accepted because it is a legal conclusion. *Id*. at 154–58. Nothing about that testimony would have impeached Ms. Calderon's testimony.

The second instance Mr. Davilla cites concerns defense counsel's effort to use a police report to impeach Ms. Calderon's testimony regarding her instruction to Gloria Torres to get rid of the can that Mr. Davilla had brought into the apartment because she feared it "could have some drugs, something illegal, some explosive or something." ECF No. 13-4 at 115. The police report was offered as a public record exception to the hearsay rule and as a prior inconsistent statement. *Id*. at 116–17. The author of the report, Officer Mitchell, was under subpoena from the State, but not by the defense; the State objected to the police report being offered as evidence because of the additional layer of hearsay in the content of the report. *Id*. at 117–18. Further, Officer Mitchell did not speak Spanish and simply "summarized some sort of conversation" and Ms. Calderon did not remember speaking to him. *Id*. at 118. During the bench conference arguing the matter, defense counsel asked the State's Attorney to have the subpoenaed police officers available, but the court made clear that the State had no obligation to do so. *Id*. at 121–22. The police officer who authored the report was never called as witnesses and the police report did not come in. *Id*. at 122–23.

The post-conviction court found this ineffective-assistance claim to be "without merit." The court noted there had been no proffer of the impeachment evidence that would have been helpful to the defense and did not otherwise come in through other testimony and cross-examination, nor had there been a showing that these witnesses would have had any evidence

20

that would have changed the outcome of the trial. ECF No. 13-12 at 40-41. The analysis of the post-conviction court is without error and the claim does not state a basis for federal habeas relief.

Mr. Davilla alleges trial counsel also rendered ineffective assistance for "lambasting" the only defense witness during closing argument. ECF No. 1 at 15. Gloria Torres was the defense's only witness; during closing argument defense counsel made the following statement: "I want to talk about Ms. Torres' testimony, and I'm going to concede, ladies and gentlemen, that it was disastrous." ECF No. 13-6 at 72. Mr. Davilla argues that this disparaging remark was damaging to the defense both because Ms. Torres was the only witness for the defense and because she is Mr. Davilla's sister. ECF No. 1 at 15. He reasons that "[b]y disparaging the testimony of Ms. Torres, [counsel] was effectively disparaging her own client given their close family ties." *Id.*

In analyzing this claim, the post-conviction court first observed that as a witness "Ms. Torres was horrible and she conflicted all the evidence and was just not credible." ECF No. 13-12 at 41. The defense's theory of the case was that Ms. Calderon, the victim, was not a credible witness and the jury should not believe her account; the strategy in the challenged statement during closing was to concede that Ms. Torres was a terrible witness in order to regain some credibility. *Id.* As the post-conviction court stated, "[t]he jury could decide for themselves with our without counsel's statement regarding Ms. Torres' testimony whether or not the defense witness was credible." *Id.* at 42. The court was not persuaded, given the other strong evidence presented in the case, that the result of the trial would have differed had counsel not made the remark during closing. *Id.* The finding that counsel was not deficient and engaged in trial strategy when making the remark challenged is without error.

Mr. Davilla also assigns error to counsel's performance for failing to prepare Ms. Torres for cross-examination. ECF No. 1 at 15. Ms. Torres testified at the first of two post-conviction hearings and explained that defense counsel "spent a short time, very little, in discussing the trial testimony." ECF No. 13-12 at 42. The post-conviction court found Ms. Torres's testimony at the post-conviction hearing did not deserve much weight because she "testified in the trial as an absolute liar and would say anything to help her brother. . . . she wasn't credible then and I don't believe her today." *Id.* at 43. Based on that finding of fact and the strength of the State's evidence, the post-conviction court correctly concluded that this claim is without merit. *Id.*

Mr. Davilla's final claim is that the cumulative effect of the errors committed by counsel rendered the trial unfair. ECF No. 1 at 16. Having found that no errors were made, the post-conviction court found this claim to be without merit and again noted that Mr. Davilla's lost opportunity to plead guilty in exchange for a 10 year sentence was wholly due to his own refusal to see that the offer made sense. ECF No. 13-12 at 44. This claim also does not provide a viable basis for federal habeas relief.

## IV. CONCLUSION

Upon review of the Petition for Writ of Habeas Corpus, the response along with the exhibits submitted, as well as Mr. Davilla's reply, this Court determines that he is not entitled to federal habeas relief. There is no basis upon which to find constitutional deficiencies in the state court proceedings, petitioner having failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C.§2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (February 22, 2017). The petitioner "must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong,"

*Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or

that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El*

*v. Cockrell*, 537 U.S. 322, 327 (2003). There has been no substantial showing of the denial of a

constitutional right. *See* 28 U. S.C.§ 2253(c)(2). Accordingly, the petition shall be denied and a

certificate of appealability shall not issue.

A separate Order follows.


Dated: <u>September    27, 2018</u>                         <u>          /s/                              </u>
                                                          GEORGE J. HAZEL
                                                          United States District Judge